530 So.2d 121 (1988)
D.P. RIZZO
v.
Lee C. BIZZELL.
No. 58863.
Supreme Court of Mississippi.
July 13, 1988.
Rehearing Denied September 21, 1988.
Martin A. Kilpatrick, Greenville, for appellant.
Roy D. Campbell, III, Campbell, DeLong, Hagwood, Wade & Stuart, Greenville, for appellee.
Before DAN M. LEE, P.J., and ROBERTSON and ZUCCARO, JJ.
DAN M. LEE, Presiding Justice, for the Court:
This appeal is taken from an adverse judgment against plaintiff below, D.P. Rizzo, in his suit contesting the August 25, 1987, Democratic Primary runoff election for the post of Bolivar County Supervisor, District 2. Rizzo lost the runoff to Lee C. Bizzell and filed this action which was heard before a special tribunal made up of the special judge and five election commissioners of Bolivar County, Mississippi. Based on a bill of exceptions, Rizzo prosecutes this appeal specifically alleging that the special judge made erroneous findings of fact and conclusions of law concerning several alleged irregularities.

I.
On August 25, 1987, Appellant D.P. Rizzo (hereinafter "Rizzo") and Appellee Lee C. Bizzell (hereinafter "Bizzell") were runoff opponents in the second Democratic primary election for District 2 Supervisor of Bolivar County, Mississippi. Bizzell received 1,494 votes and Rizzo 1,316, a difference of 178 votes. On September 14, 1987, Rizzo filed a petition to contest the election before the Bolivar County Democratic Executive Committee, contesting the second primary election and praying that it cause new elections to be held in both the central Cleveland precinct and the east central Cleveland precinct (wherein there were 1,290 and 977 registered voters, respectively). The petition charged numerous instances of irregularities, violations of statutes *122 and fraudulent acts occurred at these two precincts.
The executive committee denied Rizzo's petition on September 23, 1987, and on October 23, 1987, Rizzo filed a complaint in the Circuit Court of the Second Judicial District of Bolivar County, Mississippi, praying that upon judicial review of the action of the executive committee, new elections be ordered in each of the involved polling places. On or about November 6, 1987, Bizzell filed an answer with defenses to the complaint including a motion to dismiss. On December 9, 1987, the specially-appointed judge entered an order setting this matter for trial on January 19, 1988. A special tribunal comprised of the special judge and the five Bolivar County election commissioners heard the trial on January 19 and 20, 1988. Bizzell entered into the office of supervisor on January 1, 1988, some three weeks prior to the trial.
At the trial's conclusion, the special judge made oral findings of fact and conclusions of law, and granted the election commissioners a period of time thereafter within which to file separate findings to be made a part of the special judge's ruling. Though he found a substantial number of the allegations to have been sustained by the evidence, the special judge held that the will of the voters could be ascertained without special elections at the involved precincts, and Bizzell was declared the winner of the second Democratic primary election. On January 26, 1988, the election commissioners filed in the trial court their separate finding of fact wherein four of the five election commissioners (Stringer, Washington, Denson and Vowell) disagreed with the special judge and concluded that a new election should be held at the east central Cleveland precinct, and three of the five election commissioners (Stringer, Washington and Denson) concluded that a new election should be held at the central Cleveland precinct.
On February 2, 1988, Rizzo filed his notice of appeal and on February 4, 1988, he filed in this Court his bill of exceptions and bond for costs as required by statute in election contests. Rizzo submits that the judgment of the special judge resulted from material errors in the findings of fact and conclusions of law, and that new elections for the office of Bolivar County, Mississippi, District 2 supervisor should be ordered at both the central Cleveland and east central Cleveland precincts.
In this Court, Rizzo submitted a bill of exceptions rather than seeking to submit a transcript as allowed under Miss. Code Ann. § 23-15-933 (Supp. 1987). Bizzell submitted two affidavits alleging Rizzo's bill of exceptions summarizing the testimony was incorrect or incomplete in several particulars, and Bizzell filed appellee's corrections/additional to the bill of exceptions.
As noted above, Rizzo contested the voting at only two precincts: 1) the east central Cleveland precinct, and 2) the central Cleveland precinct.

A. Central Cleveland Precinct.

The only allegation of irregularity at the central Cleveland precinct involved Virginia Dickerson, Bizzell's sister-in-law. There seems to be no dispute that for several hours Ms. Dickerson handed out campaign literature within 150 feet of the polling place. The special judge so found.
At the central Cleveland precinct, however, the polls were sandwiched between another polling place and a street so that no one could observe the 150-foot limit. Thus, by agreement, all campaign workers stood across the street from the polls. Ms. Dickerson apparently violated this agreement by crossing the street and campaigning close to the polls for approximately six hours, until instructed to retire to the position across the street by an election official.
Rizzo admitted that he told the Democratic executive committee that he could not say he lost votes on account of any violation at the central Cleveland precinct. Rizzo admitted his workers also distributed literature within 150 feet of the polls according to the agreement.

B. East Central Cleveland Precinct.

1) Poll watcher (Mr.) Beverly Perkins
Though Rizzo alleged some 17 separate violations, central to his claim for a new *123 election in the east central Cleveland precinct was the conduct of Beverly Perkins. Bizzell paid Perkins as a supporter and campaigner, and Bizzell assigned Perkins as a poll watcher at the precinct. Perkins, in turn, assigned other Bizzell poll watchers at the precinct.
Police arrested Perkins sometime during the morning at the polling place after Democratic executive committee sub-committee on elections chairman Willie Earl Griffin swore out a warrant for disturbing the peace. Perkins later was released and returned to the east central Cleveland precinct and continued his poll watching.
Griffin testified, and the special judge found, that Perkins violated the restriction on campaigning within 150 feet of the polling place, although the only pieces of literature Perkins might have had were brochures for a former gubernatorial candidate eliminated in the first primary.
Several Rizzo supporters testified that Perkins told them the election had "already been wrapped up." These and other Rizzo supporters testified that Perkins harassed and discouraged voters.

2) Election Managers Howard Hughes and Margaret Little
Perkins' conduct was not the sole irregularity alleged to have occurred at the east central Cleveland precinct. Two poll workers, Manager/Bailiff Howard Hughes and manager Margaret Little, violated ballot secrecy provisions according to Rizzo's witnesses.
Two different people heard Hughes tell persons they could not have assistance despite their having requested it (BE 6), though this may have been because they were not blind, disabled or illiterate.
Bizzell introduced testimony from several of his poll watchers and campaigners which contradicted Rizzo's witnesses. Bizzell's witnesses basically testified that they did not see Hughes or Mrs. Little looking in voting booths and minimized Perkins' wrongdoing.

3) Candidate Lee C. Bizzell
The evidence indisputably showed that Bizzell gave money to election manager Mrs. Little, but he later retrieved it. Rizzo, Orlando Blanks and presumably others saw Bizzell enter the east central Cleveland precinct at one point during the day and give $20 to Margaret Little. Bizzell made no attempt to conceal this gift and he and Mrs. Little testified it was only for refreshments for the poll workers. Blanks (the Mabus poll watcher), overheard that the $20 was for refreshments and objected to it. Bizzell stated he got the money back from Mrs. Little through another person.

4) Democratic Executive Committee Member Charles Williams
Charles Williams, a former Rizzo supporter who supported Bizzell, was a member of the Democratic executive committee elections subcommittee. Subcommittee members recommended poll workers to the full committee for their particular precincts, thus Williams apparently recommended Hughes and Little for the east central Cleveland precinct. Williams and Rizzo had a falling out when then Supervisor Rizzo asked for Williams' resignation from a county agency position to which Rizzo had originally appointed him. The special judge found that Williams should not have participated in the executive committee review of the original election contest because of this conflict of interest. The special judge found that Williams' conduct did not effect the outcome of the election contest, however.

C. Findings.

The special judge found evidence to support several allegations, but determined ultimately that none of the improprieties required ordering a new election. The will of the voters could be ascertained, and there was no conduct of a fraudulent nature.
Specifically, the special judge found:
1) Beverly Perkins violated the 150-foot rule and Perkins' conduct constituted "rather serious technical violations" which should have led to his removal by the party employing him. The evidence was abundant *124 that Perkins corralled voters in the street, but evidence was insufficient to establish that he accompanied them into voting booths. Perkins constantly harassed and annoyed people and otherwise made himself obnoxious.
2) There was insufficient evidence that polling officials entered voting booths on more than one occasion. The special judge found the evidence conflicting and he stated there seemed to be "some confusion among the witnesses as to who was an official and who was a campaigner."
3) The proof was "unclear and perhaps insufficient" to establish that on more than one occasion polling officials refused to permit a voter to have the person of their choice assist them in voting.
4) Specifically, as to eligible voter Ernest Jones, it was not clear whether Jones made known his wish to have a particular person assist him, and thus any violation of his right to assistance was not willful or deliberate.
5) Bizzell admitted handing money to an election official, which constituted a technical violation and an absence of good judgment, but the transfer was not intended to affect the outcome of the election.
6) Charles Williams and another Democratic executive committeeman, Larry Carter, may have had an interest in the election such that they should have recused themselves from the committee deliberations on Rizzo's petition, but that action was not being reviewed by the court.
7) Ms. Dickerson did indeed violate the 150-foot rule at the central Cleveland polling place.
8) No fraudulent conduct occurred at either box.
In contrast, the election commissioners filed findings January 25, 1988, in which they concluded that Perkins wilfully violated voting laws in an attempt to further Bizzell's candidacy, and that polls managers acquiesced in these violations. The commissioners' tribunal also found, unanimously, that two of the election managers at east central Cleveland precinct violated the secrecy of the ballot by pulling the voting machine curtains or otherwise observing voters without their consent. They also found that a substantial number of blind, disabled or illiterate voters were denied assistance by a person of their own choosing. A majority of the five commissioners on the tribunal found that a new election should be held in the east central Cleveland precinct. A majority likewise found Ms. Dickerson's violations of voting laws at the central Cleveland precinct to be wilful and intentional.
The commissioner casting the deciding vote on all split commission findings was David W. Washington. On voir dire before the special judge, Washington acknowledged he supported Rizzo and had previously helped him organize campaign workers. Washington stated that he had gone to the east central Cleveland precinct and seen wrongdoings, which he reported to counsel for the election commission. The special judge said that had the final decision rested with the election commission, then Washington would have been disqualified. Since the special judge had the final decision, Washington was not disqualified.
Following this judgment Rizzo perfected this appeal and it comes to this Court upon expedited review pursuant to Miss. Code Ann. § 23-15-933 (Supp. 1987).

II.

To What Extent May this Court Make Its Findings of Fact?
Appellant Rizzo makes much of the fact that members of the Bolivar County Election Commission dissented and filed separate findings of fact from those made by the special judge. He argues that this Court is not bound by the facts below, and indeed does not have to give the normal deference given the findings of fact by a trial court since there were dissenters.
Miss. Code Ann. § 23-15-933 (Supp. 1987) provides:
Within three (3) days after judgment rendered, unless a longer time not exceeding four (4) additional days be granted by the trial judge, the contestant or contestee, or both, may file an appeal to *125 the Supreme Court upon giving a cost bond in the sum of Three Hundred Dollars ($300.00), together with a bill of exceptions which shall state with appropriate fullness the point or points of law at issue with a sufficient synopsis of the facts to fully disclose the bearing and relevancy of the said points of law, the said bill of exceptions to be signed by the trial judge, or in case of his absence or refusal, or disability, by two (2) disinterested attorneys, as is provided by law in other cases of bills of exception. If the findings of fact have been concurred in by all the commissioners in attendance, provided as many as three (3) of the commissioners are and have been in attendance, the facts shall not be subject to review on appeal, and the bill of exceptions shall not set up the evidence upon which the facts have been determined. But if not so many as three (3) of the commissioners are and have been in attendance or if one or more of the commissioners dissent, a transcript of the testimony may be filed with the bill of exceptions, or within such short time thereafter as the Supreme Court may allow, and the Supreme Court, upon a review thereof, may take such finding upon the facts as the evidence requires; giving only such consideration as the court may think warranted to the presumption of correctness of the conclusions of the trial judge. The appeal shall be immediately docketed in the Supreme Court and referred to the court en banc upon briefs without oral argument, unless the court shall call for oral argument, and shall be decided at the earliest possible date, as a preference case over all others, and such judgment shall be entered and certified as the trial tribunal should have entered and certified, with the same effect as had such judgment been entered by the trial tribunal and no appeal had been taken therefrom.
[emphasis added] However, the Legislature evidently favored the findings of the special judge over those of the commissioners. Miss. Code Ann. § 23-15-931 (Supp. 1987) provides:
When the day for the hearing has been set, the circuit clerk shall issue subpoenas for witnesses as in other litigated cases, and he shall also issue a summons to each of the five (5) election commissioners of the county, unless they waive summons, requiring them to attend said hearing, throughout which hearing the said commissioners shall sit with the judge or chancellor as advisors or assistants in the trial and determination of the facts, and as assistants in counts, calculations and inspections, and in seeing to it that ballots, papers, documents, books and the like are diligently secured against misplacement, alteration, concealment or loss both in the sessions and during recesses or adjournments; the judge or chancellor being, however, the controlling judge both of the facts and the law, and to have all the power in every respect of a chancellor in term time; and the tribunal shall be attended by the sheriff, and clerk, each with sufficient deputies, and by a court reporter. The special tribunal so constituted shall fully hear the contest or complaint de novo, and the original contestant before the party executive committee shall have the burden of proof and the burden of going forward with the evidence in the hearing before the special tribunal. The special tribunal, after the contest or complaint shall have been fully heard anew, shall make a finding dictated to the reporter covering all controversial material issues of fact, together with any dissents of any commissioner, and thereupon, the trial judge shall enter the judgment which the county executive committee should have entered, of which the election commissioners shall take judicial notice, or if the matter be one within the jurisdiction of the State Executive Committee, the judgment shall be certified and promptly forwarded to the Secretary of the State Executive Committee, and in the absence of an appeal, it shall be the duty of the State Executive Committee forthwith to reassemble and revise any decision theretofore made by it so as to conform to the judicial judgment aforesaid; provided that when the contest is *126 upon a complaint filed with the State Executive Committee and the petition to the court avers that the wrong or irregularity is one which occurred wholly within the proceedings of the state committee, the petition to the court shall be filed in the circuit or chancery court of Hinds County and, after notice served, shall be promptly heard by the circuit judge or chancellor of that county, without the attendance of commissioners.
[emphasis added]
Among the members of the tribunal, then, the special judge is the "controlling judge" of both the facts and the law, though the commissioners sit as advisors to the determination of facts. Neither statute contemplates what occurs when a majority of the commissioners dissent, but § 23-15-931 seems to suggest that the special judge is the true trier of facts.
Under § 23-15-933, this Court may make its own findings based on the evidence, giving only such presumption to the correctness of the special judge's findings as warranted. Rizzo suggests that, upon independent review of the facts as developed below, we should, in effect, adopt the findings of the dissenting election commissioners. This we decline to do.
The proof at the hearing was conflicting. The special judge was in a position to judge the credibility of the witnesses before him. We work from a cold record, and with the additional limitation that the record is only a bill of exceptions, not a transcript.
The reasons for deferring to the special judge in this instance are obvious. The Legislature seemingly took notice of the fact that an objective fact finder, one removed from the political turmoil surrounding the election, is necessary in election contests. Here we have the additional factor that one of the election commissioners dissenting to the special judge's findings had a direct interest in the outcome and should have been removed from the tribunal. Finally, the commissioners also took the opportunity in their findings to chastise the democratic executive committee for its management of the primary election. Thus, it appears the election commissioners had an additional axe to grind in this case.
Under these circumstances, we cannot say the findings of the special judge were erroneous. Despite the well intentioned efforts of appellant's counsel, we do not make additional or supplemental findings along the lines of the findings suggested by the dissenting members of the Bolivar County Election Commissioners.
We adopt the findings of the special judge.

III.

A. Central Cleveland Precinct.

The special judge found that the evidence "is sufficient to generally support" the allegation that Ms. Dickerson improperly campaigned within 150 feet of the polling place, although she did move back across the street behind the agreed line after being told to do so by an election official.
Finding no fraud or intentional misconduct, the special judge found he could ascertain the will of the voters.
At issue is the prohibition against campaigning found in Miss. Code Ann. § 23-15-895 (Cum.Supp. 1987). That section provides:
It shall be unlawful for any candidate for an elective office or any representative of such candidate to post or distribute cards, posters or other campaign literature within one hundred fifty (150) feet of any entrance of the building wherein any election is being held. It shall be unlawful for any candidate or a representative named by him in writing, to appear at any polling place while armed or uniformed, nor shall he display any badge or credentials except as may be issued by the manager of the polling place.
Miss. Code Ann. § 23-15-593 (Cum.Supp. 1987) pertains to irregularities involving violations of the 150-foot provision. Since it is supplemental to and not inconsistent with our statutes governing use of voting machines, the fact that Miss.Code *127 § 23-15-593 purports to concern ballot box irregularities does not restrict its application to this case. See Miss. Code Ann. § 23-15-449 and -451 (Cum.Supp. 1987). Miss. Code Ann. § 23-15-593 provides:
When the ballot box is opened and examined by the county executive committee in the case of a primary election, or county election commissioners in the case of other elections, and it is found that there have been failures in material particulars to comply with the requirements of Section 23-15-591 and Section 23-15-895 to such an extent that it is impossible to arrive at the will of the voters at such precinct, the entire box may be thrown out unless it be made to appear with reasonable certainty that the irregularities were not deliberately permitted or engaged in by the managers at that box, or by one (1) of them responsible for the wrong or wrongs, for the purpose of electing or defeating a certain candidate or candidates by manipulating the election or the returns thereof at that box in such manner as to have it thrown out; in which latter case the county executive committee, or the county election commission, as appropriate, shall conduct such hearing and make such determination in respect to said box as may appear lawfully just, subject to a judicial review of said matter as elsewhere provided by this chapter. Or the executive committee, or the election commission, or the court upon review, may order another election to be held at that box appointing new managers to hold the same.
The intent of the statute appears to be that violations of the 150-foot rule will not necessarily require throwing out a precinct box. Where the violations involve "failures in material particulars ... to such an extent that it is impossible to arrive at the will of the voters at such precinct," the entire box may be thrown out; however, if it appears "with reasonable certainty" that the violations were not condoned by any of the election precinct managers for the purpose of electing or defeating a certain candidate, then a hearing should be held and the commission or executive committee should make such determination as is just. The statute does not rule out an order either by the election body or by the court upon review, holding another election at that precinct with new managers.
At the central Cleveland precinct no one, including Rizzo's supporters, could comply with the 150-foot rule. The testimony was that Ms. Dickerson did not attempt to intimidate or harass anyone, and she did move back across the street and remained there after being instructed to do so by a polling official. There was no evidence that Ms. Dickerson's actions were engaged in or permitted by the election officials, or that Bizzell authorized or knew of Ms. Dickerson's violations.
The special judge thus found that the violation was technical, not "material," and the will of the voters at that precinct could be ascertained. We find no error here.

B. East Central Precinct.

Most important here were the findings of the special judge relating to the will of the electorate. The proof without dispute shows a pattern of conduct by Beverly Perkins disruptive of the electoral process.
In addition to violating the 150-foot rule, the evidence of Perkins' conduct suggests possible criminal violations of election laws prohibiting disturbing an election, Miss. Code Ann. § 97-13-21 (1972), and intimidating electors to prevent voting, Miss. Code Ann. § 97-13-39 (1972).
In his findings, the special judge did not make clear whether he considered Perkins' conduct so severe that the results of the voting in the East Central Cleveland Precinct should have been thrown out. We certainly have no hesitation in expressing displeasure with the election process described in this record. We might agree that discarding the east central Cleveland precinct votes is appropriate, but this does not automatically mean a new election must follow. The special judge did find that even if the results were thrown out, it was still possible to ascertain the will of the electorate.
Assuming the special judge found that Rizzo's contest was successful, necessitating *128 the results from this precinct being thrown out, we must turn to the test announced in Noxubee County Democratic Committee v. Russell, 443 So.2d 1191, 1197-98 (Miss. 1983):
When an election has been successfully contested, this Court has employed different tests over the years to aid its determination of what form of relief is in order. By various routes, we have attempted to discern whether the entire election should be thrown out or only the tainted votes. We have employed a two pronged test which though it has been stated in different ways, essentially provides that special elections will be required only when (1) enough illegal votes were cast for the contestee to change the result of the election, or (2) so many votes are disqualified that the will of the voters is impossible to discern. Walker v. Smith, 213 Miss. 255, 56 So.2d 84, suggestion of error, 213 Miss. 263, 264, 57 So.2d 166, 167 (1952); Pyron v. Joiner, 381 So.2d 627 (Miss. 1980).
Here, as the disqualification of the illegal votes does not change the result of the election, we need only consider whether the irregularities were substantial enough to warrant a special election. In Walker, we clarified the manner in which we make this determination, finding that the question
depends upon the facts and circumstances in each particular case, including the nature of the procedural requirements violated, the scope of the violations, and the ratio of illegal votes to the total votes cast. 213 Miss. at 264, 57 So.2d 166.
As this rule has been applied in our case law, the nature of the procedural violation is important because if the irregularities are due to fraud or willful violations of the election procedure, this Court will not hesitate to order a new election, even though the percentage of illegal votes is small. See, e.g., Harris v. Stewart, 187 Miss. 489, 193 So. 339 (1940); Hayes v. Abney, 186 Miss. 208, 188 So. 533 (1939).
The scope of the violations and the ratio of illegal votes are significant, because even in the absence of fraud, the disenfranchisement of a significant number of voters will cast enough doubt on the results of an election to warrant voiding it. As a rule, if more than thirty percent of total votes have been disqualified, a special election will be required. See, e.g., Wallace v. Leggett, 248 Miss. 121, 158 So.2d 746 (1963); Ulmer v. Currie, 245 Miss. 285, 147 So.2d 286 (1962); Sinclair v. Fortenberry, 213 Miss. 219, 56 So.2d 697 (1952); May v. Layton, 213 Miss. 129, 55 So.2d 460 (1951).
On the other hand, when the percentage of illegal votes is smaller, even though the winning margin is less than the number of illegal votes, a special election may not be required. Pyron v. Joiner, 381 So.2d 627 (Miss. 1980) (disqualification of 3.9 percent of the votes did not warrant special election.) Walker v. Smith, 213 Miss. 255, 56 So.2d 84, suggestion of error 57 So.2d 166 (1952) (disqualification of six percent of the total vote did not warrant a special primary election.)
Applying the Russell test to the facts of this case, it is apparent that a new election is unnecessary. First, it is clear that by discarding the illegal votes the outcome is unchanged, for without any votes from the precinct Bizzell won the election. There was no fraud practiced and the ratio of illegal votes to total votes, discarding all 355 votes at the east central Cleveland precinct, is 355 to 2817, or slightly more than 12%. The nature of the violations, while serious, cannot totally control the disposition of this case, for we must balance the public interest with that of the successful contestant.
When deciding whether a special election is warranted,
we recognize competing interests which must be weighed and balanced. While the voters are not parties to this contest, their interests are paramount. Special elections are a great expense for the county and its taxpayers. Beyond that, the turnout for a special election is never as great as when there are a number of candidates on the slate. By contrast, we feel that the rights of the individual *129 candidates cannot be allowed to overshadow the public good.

Russell, 443 So.2d at 1197 [emphasis added].
Rizzo argues that a special election for just the east central Cleveland precinct is warranted. While it may be a permissible alternative under Miss. Code Ann. § 23-15-593 (Cum.Supp. 1987), given the circumstances, we cannot agree. In addition to the factors noted above, we cannot ignore the fact that Rizzo carried the precinct convincingly despite the violations. Even the somewhat less expensive alternative of a special election confined to the east central Cleveland precinct cannot, on balance, be rationalized here.
Since Bizzell received a total of 178 more votes than Rizzo, Rizzo would have to acquire a net increase of 178 votes at the east central Cleveland precinct to effect the outcome. The total number of votes at the precinct was 355; Rizzo received 243 votes to 112 for Bizzell. Rizzo out-polled Bizzell by this same two-to-one margin at this precinct in the first primary, as well as in the runoff. Thus, unless Bizzell's supporters would totally abstain from voting, Rizzo would likely need an increase in turnout of roughly 50% at a special election just to have a chance to obtain the needed 178 additional votes. There was virtually no evidence implying that qualified electors would turn out in any greater numbers, nor was there any real evidence that voters were denied or prevented from voting by Perkins. Thus, little evidence suggested turnout might improve at all, much less by a large percentage.
Under the circumstances of this case, the special judge correctly determined that the will of the voters could be ascertained and a new election was unnecessary.
The decision of the special judge declaring Bizzell the winner of the second Democratic primary for the position of supervisor, District 2, in Bolivar County, Mississippi, is hereby affirmed.
AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and PRATHER, ROBERTSON, SULLIVAN, ANDERSON, GRIFFIN and ZUCCARO, JJ., concur.