# IN THE SUPREME COURT OF MISSISSIPPI

# NO. 2003-EC-02169-SCT

*JEP BARBOUR*

*v.*

*PHILIP GUNN*

| | |
|---|---|
| DATE OF JUDGMENT: | 9/29/2003 |
| TRIAL JUDGE: | HON. FORREST A. JOHNSON, JR. |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | DAVID C. DUNBAR |
| ATTORNEY FOR APPELLEE: | TREY CHRISTIAN DELLINGER |
| NATURE OF THE CASE: | CIVIL - ELECTION CONTEST |
| DISPOSITION: | AFFIRMED - 04/08/2004 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

## EN BANC.

## GRAVES, JUSTICE, FOR THE COURT:

¶1. Jep Barbour was originally certified as the winner of the Mississippi House of Representatives District 56 race in the August 5, 2003, Republican primary election. His opponent in the primary, Philip Gunn, filed an election contest on September 8, 2003, with the State Republican Executive Committee (SREC). After meeting with the SREC, but prior to a scheduled hearing on the matter, Gunn filed for judicial review in the Circuit Court of the First Judicial District of Hinds County. After hearing the matter, in circuit court, Special Judge Forrest A. Johnson, Jr., ordered that a new election be held in two precincts, one of which was not included in the text of a resolution of the Legislature as being in House District 56. Barbour filed a notice of appeal and a motion for stay with this Court. An order was entered on October

7, 2003, denying the stay, but expediting the appeal. The special election was held on October 14, 2003, and the results placed Gunn ahead of Barbour. By order of October 30, 2003, this Court affirmed the decision of the trial court with an opinion to follow; this is that opinion.

## FACTS AND PROCEEDINGS IN THE TRIAL COURT

¶2. In the House District 56 Republican primary election on August 5, 2003, Barbour defeated Gunn by a vote of 2,804 to 2,787. Gunn filed a contest with the SREC on September 8, 2003, alleging that errors in some precincts prevented citizens of District 56 from voting in the election.

¶3. To ensure substantial population balance in House Districts, some voting precincts are subdivided. For example, one precinct in Clinton is subdivided into three "sub-precincts"—A, B, and C. Pursuant to Joint Resolution 1 of the Mississippi Legislature, House District 56 includes the Hinds County precincts of Pinehaven, Brownsville, Tinnin, Clinton 1 (C1), Clinton 2 (C2B) and Clinton 3 (C3), all of which are split, and precincts in Warren, Yazoo and Madison counties. Clinton 2 is further divided into sub-precincts A, B and C; only precinct C2B is in House District 56.

¶4. Gunn asserted in his election contest that there were errors in the C1 and C2 precincts; specifically, that the names of 216 voters who live in the C2 precinct were put in the wrong poll book. He also alleged some voters were barred from voting because they were erroneously placed in the wrong district. Gunn asserted that 38 voters who live in C2A were allowed to vote in the C2B House District 56 race and that those illegal votes were in the Clinton 2B box.

¶5. Gunn also argued that the streets of Brookwood, Belle Place and the west side of Bellevue Street in Clinton are in House District 56, but that the Hinds County Executive Committee (HCEC) incorrectly decided the streets were not in House District 56. Gunn attached documentation stating that the aforementioned streets were shown on a census map to be in C1 and in House District 56. Gunn asked

that those citizens on certain streets allegedly denied the right to vote in the district be allowed to do so or, in the alternative, that a new election be held for the whole precinct.

¶6. The SREC chairman, legal counsel, executive director, Gunn, Barbour, and their respective counsel met on September 8, 2003, and set a full hearing date on Gunn's contest for October 2, 2003. October 2 was the earliest date that a hearing could be set because of scheduling conflicts with both parties. On September 16, 2003, Gunn filed a "Petition for Emergency Hearing, Injunctive Relief, and Judicial Relief" in the Circuit Court of the First Judicial District of Hinds County.

¶7. In his circuit court petition, Gunn asked the court to declare C4, the precinct containing the streets of Brookwood, Belle Place, and the west side of Bellevue Street, to be a split precinct, with the portion containing the referenced streets to be in House 56. C4 is listed in the text of the Joint Resolution of the Mississippi Legislature as a whole precinct in House District 72. Gunn asked this Court to order a new election in C4 or, in the alternative, reexamine the boundaries of C4 and order a new election in C1. The trial court found that the Joint Resolution of the Legislature was in error because it conflicted with the map. The map was determined to be the best and proper authority for determining the correct content of District 56, and the listing of Clinton 4 in District 72 was judged to be an error or oversight which was subservient to the map. The trial court then ordered revotes in C2B and C4.

¶8. Barbour filed his notice of appeal on October 2, 2003, and filed a Motion for Order Staying Circuit Court Order and/or Alternatively, for Emergency and Expedited Review and Consideration with this Court. This Court denied the motion for stay by an order entered October 7, 2003, but granted an expedited review of the appeal. The new elections in C2B and C4 were held on October 14, 2003, with a total of 432 votes cast, of which 420 were cast for Gunn and 12 were cast for Barbour. This was an increase from the 344 total votes cast on August 5 when Gunn only garnered 301 votes to Barbour's 43. The district

3

totals shifted accordingly; Gunn's totals after the primary were 2,787 votes, which grew to 2,906 after the revote. Barbour lost votes, going from his original total of 2,804 votes to 2,773 votes. Gunn won the election by 133 votes, despite his previous "loss" by seventeen votes.

¶9.     This Court entered an order on October 30, 2003, affirming the trial court and now considers three issues:

I. Did the trial court have authority to hear the issue?

II. Could the trial court properly allow a partial revote?

III. Is the Census map or the Joint Resolution of the House controlling?

¶10.     For the reasons discussed below, we find that the trial court did have authority to hear the election contest; that the partial revote was proper; and that the census map, rather then the Joint Resolution, controls the House Districts. Thus, we affirm the judgment of the trial court.

## DISCUSSION

¶11.     All five Hinds County Election Commissioners who attended the September 29, 2003, hearing as advisors on Gunn's petition agreed with the factual findings of the trial court. Their unanimous agreement places those findings outside the review of this Court. *See* Miss. Code Ann. § 23-15-933 (Rev. 2001) ("If the findings of fact have been concurred in by all the commissioners in attendance, provided as many as three (3) commissioners are and have been in attendance, the facts shall not be subject to appellate review.").[1] All questions of law are considered de novo by this Court. *See **Saliba v. Saliba**,* 753 So.2d 1095, 1098 (Miss. 2000).

## I. Did the trial court have authority to hear the issue?

---

[1] If there had been "*not* so many as three (3) of the commissioners . . . in attendance, or if one or more commissioners dissent[ed]," it is within our power to make our own factual findings, since, "upon review [of those cases] . . . the Supreme Court may make such findings as the evidence requires." Miss. Code Ann. § 23-15-933 (emphasis added).

¶12. On appeal, Barbour asserts that Gunn had no statutory authority to file his petition in circuit court–partially because he did not give the SREC a reasonable opportunity to act upon his petition. Barbour further asserts that the necessary requirements were not met for Gunn to proceed under Miss. Code Ann. § 23-15-927 (Rev. 2001), which states in part:

> When and after any contest has been filed with the county executive committee, or complaint with the State Executive Committee, and the said executive committee having jurisdiction shall fail to promptly meet or having met shall fail or unreasonably delay to fully act upon the contest or complaint, or shall fail to give with reasonable promptness the full relief required by the facts and the law, the contestant shall have the right forthwith to file in the circuit court of the county wherein the irregularities are charged to have occurred . . . a sworn copy of his said protest or complaint, together with a sworn petition, setting forth with particularity wherein the executive committee has wrongfully failed to act or to fully and promptly investigate or has wrongfully denied the relief prayed by said contest, with a prayer for a judicial review thereof . . . The filing of such petition for judicial review in the manner set forth above shall automatically supersede and suspend the operation and effect of the order, ruling or judgment of the executive committee appealed from.

¶13. Gunn asserts in defense that the SREC did not schedule a hearing in a timely manner, that the SREC officials indicated they may not have the authority to grant the relief he was requesting, and that there was not enough time before the general election to await the proceedings of the SREC. The trial court proceeded to hear the matter, asserting the broad powers vested in it by the Mississippi Election Code and a demand for timeliness; the general election was only thirty-six days away at the time of the hearing.

¶14. This Court agrees that the trial court properly found that it had jurisdiction to proceed in this matter. Miss. Code Ann. § 23-15-927 plainly states that an election "contestant *shall have* the right forthwith to file in the *circuit court of the county* wherein the irregularities are charged to have occurred," *if* the "executive committee having jurisdiction shall fail to promptly meet or having met shall fail or unreasonably delay to fully act upon the contest or complaint, or shall fail to give with reasonable promptness the full relief required by the facts and the law." (emphases added).

5

¶15.    So there is a simple test to be considered for filing a contest in circuit court: the committee having jurisdiction must fail to promptly meet, or unreasonably delay action, or fail to give prompt relief. The SREC officials were concerned they would not have time before the general election to decide the issue; therefore Gunn seized the reins of his complaint and steered it directly to circuit court. Taking the facts of this case as true, which we are bound to do, this is a completely permissible procedure. It is clear from the face of Miss. Code Ann. § 23-15-927 that a trial court has jurisdiction in these rare circumstances.[2] In addition, the trial court made a factual finding that the general election was so near at hand that a revote was needed immediately to preserve the rights of voters.

¶16.    The statute was crafted in that fashion to preserve the voices of the voters of Mississippi. If the trial court could not hear such a complaint, a contested primary might very well drag on past the general election, thereby disenfranchising the members of a political party. This is not permissible. The right to vote is an important badge of citizenship that should be treasured by all citizens, and Mississippi courts must safeguard it accordingly. The trial court acted in accordance with the will of the Legislature and in the best interests of the citizens of Mississippi by taking jurisdiction of the election contest.

## II. Could the trial court properly allow a partial revote?

¶17.    Miss. Code Ann. § 23-15-593 controls the contesting of primary elections. That section allows an executive committee, an election commission, or a "court upon review" to order a partial revote when "it is found that there have been failures in material particulars to comply with the requirements of Section 23-15-591 [requirements and security regarding the results of the election] and Section 23-15-895 [regulation of campaign material within 150 feet of polls] to such an extent that it is impossible to arrive at

_____

[2]We do not address, nor do we need to, whether the SREC could have determined the matter itself.

the will of the voters at such precinct." (emphasis added). More simply put, if the specified failures are present, and the will of the voters cannot be determined, a revote is proper.

¶18.   We have little precedent regarding the application of Section 23-15-593. ***Rizzo v. Bizzell***, 530 So. 2d 121 ( Miss.1988), concerned a contested supervisor's race in Bolivar County where a candidate's sister-in-law handed out campaign literature too close to a polling place, in violation of § 23-15-895. ***Id.*** at 122.  Yet "[t]he special judge . . . found that the violation was technical, not 'material,' and [so] the will of the voters at that precinct could be ascertained [without a revote]." ***Id.*** at 127.

¶19.   In the case sub judice, the problems are not "technical;" an entire sub-precinct was not allowed to vote.  There can be no ***Rizzo*** interpretation of "the will of the voters," because those voters were never allowed to vote.  This case is markedly different from ***Rizzo***, and the trial court appropriately ordered a revote in the excluded areas in complete accordance with procedures mandated by the Legislature. Because they were mistakenly not allowed to vote the first time, those voters were properly allowed to vote by the trial court.

### III. Is the Census map or the Joint Resolution of the House controlling?

¶20.   The Census map attached to the Joint Resolution controlling redistricting shows that C4 is a split precinct with a portion edging into House District 56.  Yet language in Joint Resolution 1 states that C4 is a whole precinct that exists in District 72.

¶21.   The ambiguity was correctly resolved by the trial court.  The language of the Joint Resolution demanded that the Census maps be used to determine precinct lines.  Specifically, the resolution set "boundaries of the House of Representatives districts" according to three guiding principles:  first, counties were to appear "as they existed on January 1, 2002;" secondly, precinct boundaries were delineated by "Census 2000 redistricting maps;" and last, maps were also to be guided by "boundaries of the census

7

tracts or blocks ... contained in Census 2000 redistricting maps." The resolution went on to state that "[i]t is also intended that no district shall include any of the area included within any description of any other district." (emphasis added).

¶22.     The clear language of the Joint Resolution is that the Census map should control the all districts. The Census Map shows C4 within District 56. The trial court correctly ruled on the issue.

## CONCLUSION

¶23.     For the above reasons, the judgment of the trial court is affirmed.

¶24.     **AFFIRMED.**

**WALLER, P.J., EASLEY AND CARLSON, JJ., CONCUR. COBB, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY SMITH, C.J., AND DICKINSON, J. DIAZ, J., NOT PARTICIPATING.**


**COBB, PRESIDING JUSTICE, DISSENTING:**


¶25.     The Mississippi Election Code, Miss. Code Ann. §§ 23-15-1 through 23-15-1111 (Rev. 2001 & Supp. 2003), is a comprehensive, detailed set of laws governing all aspects of the election process in the State of Mississippi. Enacted in 1986, after years of study, it consolidated the entire body of Mississippi's election law into a unified, consistent whole.[3] Within the 353 pages which currently comprise the Election Code are found specific and precise procedures to be followed at every point in the election process, including the procedures required to be followed in election contests. In my view, the majority approves a dangerous departure from the specific requirements of the Election Code for purposes of convenience and haste. It establishes a precedent of approving circumvention of statutory requirements,

---

[3]See R. Andrew Taggart, & John C. Henegan, *The Mississippi Election Code of 1986: an Overview*, 56 Miss. L.J. 535 (1986).

and, in effect, approves a redrawing of district lines without consideration of the fact that this is a legislative responsibility and without regard to the requirement of preclearance by the U.S. Attorney General under Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973c. Thus, I must respectfully dissent.

¶26. Gunn began his contest of Barbour's election as the Republican party nominee for Representative of House District 56 by filing a complaint with the SREC, pursuant to Miss. Code Ann. § 23-15-923, on September 9, 2003. The very next day the SREC chairman contacted Gunn, and the chairman scheduled a meeting with Barbour and Gunn which was held on September 12, 2003. At that meeting the SREC hearing was set for October 2 (33 days prior to the general election), by mutual agreement of the parties, to accommodate scheduling conflicts of *both* parties. For reasons unclear in the record before us, Gunn then decided not to wait for the statutorily prescribed investigation, findings, and vote of the SREC, and filed his petition for emergency hearing in the Hinds County Circuit Court on September 16, 2003. Gunn made no attempt to reschedule the October 2 meeting with the SREC to an earlier date.

¶27. Gunn's filing in circuit court was the first departure from the statutory process. Miss. Code Ann. § 23-15-927 provides that a complaint is first filed with the SREC, contesting the election of a nominee, and the contestant can file in circuit court only if "the said executive committee having jurisdiction shall fail to promptly meet . . . or shall fail to give with reasonable promptness the full relief required by the facts and the law." Further, that same code section requires that the circuit court complaint contain an affidavit "setting forth with particularity wherein the executive committee has wrongfully failed to act or to fully and promptly investigate or has wrongfully denied the relief prayed by said contest." Only upon a showing of such wrongful acts does the circuit court have authority to supersede and suspend the operation of the executive committee. Gunn did not attach the required affidavit regarding wrongdoing. In fact, no such

9

wrong doing was alleged or shown. Gunn's petition in the circuit court focused, instead, on the urgency arising out of the fast approaching general election, and stated:

> Time is of the essence. Ballots are being printed and other preparations for the General Election are proceeding. A resolution in this matter needs to be reached posthaste. An October 2, 2003, hearing date by the SREC does not leave enough time for either the SREC or the Court to implement the relief requested in the Complaint before the General Election takes place on November 4, 2003.

¶28. In his petition filed in the circuit court, Gunn asked the court to declare Clinton 4 (C4) precinct to be a split precinct, with three specific streets to be included in House District 56, or alternatively, to declare a change in the boundary of precinct C4 to place the three specific streets in Clinton 1 (C1) and to order a new election. During the circuit court hearing, it was brought to the attention of the court that the text of the Legislature's Joint Resolution 1, 2002 Regular Session, which established the entire redistricting plan for the Mississippi Legislature, states that C4 is entirely within House District 72, not in District 56 which is an adjoining district. Before hearing sworn testimony, the judge asked one of the Hinds County Election Commissioners present in the courtroom whether C4 was fully outside of District 56. The response was as follows:

> There has been a change in the description possibly. I have spoken with the Joint Legislative Committee on reapportionment and the Social Planning Development District. The Legislature did their redistricting based on census blocks. We have section blocks in Hinds County. They have therefore agreed that a portion of C4 should be in House District 56 because our section block line goes right down through a census block.

This explanation was not further developed by the court or attorneys. The record is silent as to whom the election commissioner spoke, whether there was any meeting or official action of the Joint Legislative Committee on Reapportionment (JLCR), or who "they" were that agreed that part of C4 should be in District 56. Subsequently during the circuit court hearing a letter from the staff counsel for the JLCR to Gunn was entered into evidence over objection by Barbour's counsel, but it was not an affidavit, and the

10

only attestation therein was with regard to the accuracy of the minutes of two JLCR meetings in 2001, at which it was announced that the census block information would be used and splitting of census blocks would not be permitted.

¶29. Barbour's position was that C4 was not in District 56 at all, as evidenced by the plain language of Joint Resolution 1, which lists every precinct, and split precinct, in each District. It is undisputed that C4 is listed in the text of Joint Resolution 1 as being fully within District 72. Gunn's position was that "C4 and C1 bump up against one another. These people that are in this no man's land, if you will, lie between C1 and C4. So the issue is whether they are on this side of the line or that side of the line." The only testimony during the circuit court hearing was given by John Perry, a long-time member of the Hinds County Republican Executive Committee, who was a surveyor and knowledgeable about the location of the precinct lines, and arguments of counsel. Although there were numerous references to what was said by Mike Wallace, counsel for the Republican Party, and by Phil Carter, Assistant Attorney General, regarding the proper course of action to be taken, which were allowed by the trial court over objections as to hearsay, neither of these men were called to testify. At the conclusion of the hearing, the trial court found that Joint Resolution 1 "is in error, in that the listing of ....Clinton 4 as wholly in House District 72 is in conflict with the map, which clearly shows that portions of such precinct are included in House District 56." He further found that "the map attached to the Joint Resolution of the Legislature is the best and proper authority for determining the correct content of House District 56" and that the listing of C4 in HD 72 "is an error, or oversight, which must yield to the map." He cited no authority for this position.

¶30. Although the trial court clearly recognized the Joint Resolution as the key document upon which to rely in reaching his determination, it apparently did not consider its internal provision for handling any errors which might be found in it, nor did he consider the implications of the preclearance requirements

11

which accompany every action, legislatively or otherwise, which results in a change in the make-up of a voting district. This Court, however, must consider these factors.

¶31. In addition to the provisions which list C4 entirely in District 72, and incorporate the map into the resolution, there are two other provisions which are critical to the proper determination of the case which is before this Court:

¶32. First is the provision which states the proper method of correcting errors which might be found in the Resolution after its passage: "[I]f the districts described in this resolution do not carry out the purposes hereof because of: unintentional omissions; duplication, **overlapping areas**; erroneous nomenclature; **lack of adequate maps or descriptions of political subdivisions, wards or other divisions, or of their boundary lines; then the Secretary of State, at the request of the Standing Joint Legislative Committee on Reapportionment shall, by order correct such . . . defects** in the description of districts so as to accomplish the purposes and objectives of this resolution." (emphasis added).

¶33. Second is the provision which requires that this Resolution shall be "submit[ted] . . . immediately upon its adoption by both houses of the Legislature, to the Attorney General of the United States . . . in accordance with the provisions of the Voting Rights Act of 1965. . . . and shall be in force from and after the date it is finally effectuated under Section 5 of the Voting Rights Act of 1965", and the implicit requirement that any subsequent changes to the districts in any way must also be submitted. The trial court did not mention either in its summation and bench ruling at the conclusion of the hearing.

¶34. In summary, the following errors occurred in this hastily tried case. First, Gunn did not follow the procedure set forth in Miss. Code Ann. § 23-15-923 for contesting the election of Barbour as the nominee for the House of Representatives District 56 position. Second, the circuit court did not require Gunn to

12

follow the procedure set forth in Miss. Code Ann. § 23-15-927, which requires that his petition "set forth with particularity wherein the executive committee has **wrongfully** failed to act or to fully and promptly investigate or has **wrongfully** denied the relief prayed." (emphasis added). Gunn never alleged wrongdoing by the SREC; he simply alleged that the October 2, 2003, date for the SREC hearing (to which he agreed initially, and never asked or attempted to have reset to an earlier date) was "not reasonably prompt" and was "an unreasonable delay." (Note again the sense of urgency.) Third, upon concluding that there was an error in the Joint Resolution 1, the circuit court chose to ignore the remedy specifically set forth in the Resolution itself (that the Secretary of State, at the request of the JLCR, shall by order, correct such error). Fourth, the circuit court, in essence, redrew the lines of Districts 56 and 72, by determining that voters who live on certain streets within the Clinton 4 precinct are in District 56, and not in District 72 as shown on the precinct list in Joint Resolution 1. It reached this determination by arbitrarily deciding that the map controls over the list, without citing any authority for such decision. Fifth, the circuit court ordered a new primary election without any consideration of possible ramifications under the Voting Rights Act as a result of his interpretation of Joint Resolution 1.

¶35. In my view, the majority has been influenced too much by the sense of urgency articulated in Gunn's pleadings and in the trial court's hearing and resulting order, and thus has chosen to disregard the plain language of the statutes and the Joint Resolution 1. The SREC should have been allowed to do its duty under the law. The determination of district lines is uniquely the responsibility of the Legislature, and that body, acting through its JLCR, should have been notified of the discrepancy between the map and the list, and allowed to take the appropriate steps to correct that discrepancy, as set forth in Joint Resolution 1, and to ascertain that the U. S. Attorney General had no objection to such correction.

¶36. Whether that could have been accomplished in the short time involved here is not an issue and

should not affect this Court's decision. The Legislature wisely anticipated that primary election contests might not be resolved prior to the date of an election, and Miss. Code Ann. § 23-15-937 provides the procedure to be followed in such situations.

¶37. I would reverse and remand with instructions to allow the SREC to fulfill its duties, and apply the knowledge gained as a result of the circuit court hearing and this opinion to have the Legislature pursue the remedy for correcting errors set forth in Joint Resolution 1. It may well be that the Legislature will reach the same result as did the circuit judge and will then amend the list to comport with the map. But that is for the Legislature to decide, not the courts. Once that has been determined by the Legislature, and the Voting Rights Act submission, if any is required, has been made, then the statutory process can continue just as it would have if the SREC had been allowed to determine how to handle the primary election contest initially.

¶38. For these reasons, I respectfully dissent.

**SMITH, C.J., AND DICKINSON, J., JOIN THIS OPINION.**